UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DERBY FABRICATING, LLC
d/b/a DERBY FABRICATING                                                                PLAINTIFF

v.                                                                    CIVIL ACTION NO. 3:03CV-803-S

PACKING MATERIAL COMPANY, INC.                                                         DEFENDANT

**MEMORANDUM OPINION**

This matter is before the court on cross-motions for summary judgment in this contract action. The plaintiff, Derby Fabricating, LLC, is a die cutter and converter of non-metallic component parts for automotive and appliance applications. During the time period in issue, Derby supplied automotive customers with die cut adhesive-backed foam for use in automobile door, dashboard, headliner, and airbag components. The defendant, Packing Material Company, Inc. ("PMC"), was a supplier of polyethylene foams for use in this industry. PMC supplied foam to Derby for its automotive contracts.

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes

it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

## I.  History of the Dow Ethafoam Settlement

One of the products that PMC sold to Derby was Dow Ethafoam. In 2002, Derby began experiencing adhesive-to-foam failures which caused the foam blocks to fall off the automobile headliners in which they had been installed. Derby received complaints from Lear and Toyota about the problem. Upon investigation, Derby concluded that PMC was at fault for the product failures due to PMC's use of silicone on cutting equipment in its plant. Derby demanded reimbursement for lost business and expenses in connection with the Dow Ethafoam component failures.

After extensive negotiations, a settlement was entered into by the parties. The terms of that settlement were memorialized in a letter dated December 30, 2002 from James Foster, president of PMC, to Alan Loyd, president of Derby. The letter stated, in pertinent part:

> The items below confirms [sic] the agreement we reached earlier today:
>
> Derby and PMC agree to a total settlement amount of $100,000
> PMC will allow an immediate credit of $25,000
>
> Derby will wire transfer today payment for the September and October invoices outstanding, less the credit amount. This will be worked out between Jim Gross and Dave Ecton per your suggestion
>
> The balance of $75,000 will be credited equally over four years on a quarterly basis. We can discuss whether Derby will short pay PMC invoices or PMC will issue a check.
>
> Both companies will return to normal operations, with PMC shipping orders and Derby remitting payment according to prior terms of sale...
>
> We are pleased we could work out an agreement to resolve this matter amicably. I'm sure we will mutually benefit by returning to normal operations and growing our business together.

There is no dispute that PMC bought its peace concerning the silicone contamination accusations at the price of $100,000 if the settlement remains in place. There is no dispute that Derby agreed to accept $100,000 in the form of credits against purchases over a period of four years under that agreement. Additionally, there is no dispute that an integral part of the settlement was the requirement that the companies to return to normal operations according to their prior sales terms.

Derby continued purchasing various products from PMC, and the initial credit of $25,000 was applied, according to the settlement terms. One quarterly credit was applied thereafter to the outstanding settlement balance, but approximately $70,000 of the settlement amount remains unpaid.

This lawsuit is the result of Derby's termination of its business relationship with PMC in 2003. In this action, Derby seeks to rescind the settlement and recover damages from PMC for providing allegedly contaminated Dow Ethafoam. Derby seeks partial summary judgment on the issue of rescission of the settlement. PMC contends that it is entitled to summary judgment on all claims against it on the ground that Derby settled its claims concerning the Dow Ethafoam matter, and that PMC has done nothing to call the integrity of the settlement into question. In fact, PMC asserts that Derby wrongfully terminated the relationship between the parties and that, as a result, PMC does not owe Derby the remaining balance of the settlement amount.

## II.  History of Toilon Sales

In September, 2001, PMC responded to a request from Derby for a price quote. It quoted certain "Toilon 3X Crosslinked P.E. Bun Foam." Thereafter, Derby ordered Toilon foam by reference to "TB" with certain other information contained in the description of the product ordered. It also referenced a part number for Toilon brand foam in its purchase orders. For a period of time, the packing slips generated by PMC also contained descriptive information that indicated that it had shipped Toilon foam.

In or around March of 2003, a Derby employee noticed that the descriptive information provided by PMC with the shipped product no longer referenced Toilon-brand foam. The description did not indicate a brand name, but rather contained the designation "XLPE." The parties agree that this is a generic abbreviation for "crosslinked polyethylene," and that such a designation could apply to any brand of crosslinked polyethylene foam including Toilon. PMC admits, however, that when it used this designation, it had not shipped Toilon foam, as ordered by Derby, but rather had substituted another brand in filling the orders.

The terms and conditions appearing on the reverse side of Derby's purchase orders stated in pertinent part:

> 2. Warranty: Seller expressly warrants that all goods covered by this order...(b) shall conform to the drawings, specifications, descriptions, and samples furnished or specified by Buyer...Without Buyer's written consent, no goods may be substituted in lieu of those specified...
>
> 6. Changes: Changes may be made by Seller in drawings, specifications, descriptions, shipping instructions, quantities and/or delivery schedules only by prior written consent of Buyer...Buyer may at any time insist upon strict compliance with these terms and conditions, notwithstanding any previous custom, practice, or course of dealing to the contrary.

Upon investigating the matter, Derby learned that PMC had been substituting another brand of foam for the Toilon brand since June of 2002. As a result of this discovery, Derby ceased doing business with PMC. It demanded payment of the sum remaining under the settlement, but PMC refused to pay it.

### III. Analysis

Derby contends that the substitution of another brand for Toilon foam without notice and approval of the substitution constituted a breach of the terms of their sales agreement. Derby alleges that PMC's actions constituted a substantial and material breach of the term of their settlement that required the parties to "return to normal operations, with PMC shipping orders and Derby remitting payment according to prior terms of sale."

As noted in *Evergreen Land Company v. Gatti*, 554 S.W.2d 862 (Ky.App. 1977), "It is elementary that a contract may not be rescinded unless the non-performance, misrepresentation or breach is substantial or material. The court does not look lightly at rescission, and rescission will not be permitted for a slight or inconsequential breach." *See also, United States ex rel. Pickard v. Southern Construction Company*, 293 F.2d 493 (6th Cir. 1961), *rev'd on other grounds*, 371 U.S. 57, 83 S.Ct. 108, 9 L.Ed.2d 31 (1962)(well settled rule that under certain conditions a material breach of contract by one of the parties thereto confers upon the other party right to rescind contract; breach must be so substantial and fundamental as to go to the very root of the contract).

Derby claims that paragraphs two and six of the sales terms precluded the substitutions of another brand of foam for the Toilon specified in the purchase orders. Derby asserts that it was not given notice of the substitution and did not consent to it. There is a dispute of fact whether oral notice was given by PMC to Derby. PMC further contends that its change in description whereby it deleted the Toilon designation and referenced "XLPE" constituted notice to Derby of the substitution. However, oral or written notice notwithstanding, it is undisputed that Derby did not consent in writing to the substitution of brands.

PMC contends that the terms of sale did not prohibit its unilateral decision to substitute a different brand of foam, notwithstanding its quotation and Derby's order of Toilon. Essentially, PMC's contention is that "foam is foam." It contends that polyethylene foam is a generic product. It suggests that one brand may be substituted for another brand of the same tolerances. Derby agrees that there is no readily apparent distinction between brands such that they could have told Toilon from another brand of foam upon visual inspection.

There is a dispute of fact whether Toilon and the foam substituted by PMC are, in fact, interchangeable products. However, even assuming *arguendo* that they are interchangeable, Toilon is what was quoted, Toilon is what was specified in the purchase order, and without written consent, "no goods may be substituted in lieu of those specified."

Further, even if we were to accept *arguendo* that "foam is foam," the sales terms still prohibit changes in descriptions without the prior written consent of Derby. An unauthorized change in the description from the Toilon brand to a generic "XLPE" designation appears to be precluded by paragraph six of the sales terms.

PMC asserts that Derby should be precluded from arguing a breach of the sales terms by virtue of its unquestioning acceptance of the substitute product over a period of months. First, the parties are in agreement that visual inspection of the foam would not have revealed the substitution. Therefore, PMC would have to first establish that it gave notice of the change to Derby.

The court need not address the dispute of fact concerning notice, however. The sales terms state unequivocally that *at any time* Derby may insist upon strict compliance with these terms and conditions, *notwithstanding any previous custom, practice, or course of dealing to the contrary*." Thus Derby was within its rights under the terms of the agreement to conclude in March 2003 that PMC's actions were unacceptable.

Finally, PMC suggests that since Derby did not receive complaints from its customers concerning the substituted product, and it now buys the substitute product from another supplier, Derby has suffered no injury by reason of PMC's substitution. PMC reasons that if Derby suffered no injury, then it had no basis to terminate its business dealings with PMC.

Derby concedes that it did not receive complaints. Derby also admits that it does buy the substituted product elsewhere. However, Derby does not seek damages for injury from the sale of the substituted product. Rather it contends that the substitution of another brand for what it specified and the unilateral and unauthorized change in the description of the product breached the sales terms and therefore PMC did not "return to normal operations" as required by the settlement. Derby seeks rescission of the settlement, not damages for the conduct which it claims entitles it to rescission.

Further, PMC urges that because there was no damage to Derby's business by reason of the substitution, any breach of the settlement it may have committed cannot be substantial and material. It is not the substitution *per se* of which Derby complains, however.

Derby has identified specific sales terms with which PMC admittedly did not comply. PMC's focus on the apparent lack of impact on Derby's customers is off the mark. The breach must impact the settlement substantially and materially in order for it to be subject to rescission. It is apparent that resumption of normal operations between the parties was essential to the successful performance of the settlement. Indeed, it was so essential to PMC that it now urges that without the continuation of normal business operations between them it is relieved of its obligation to pay the remaining balance owed under the settlement. It is PMC's position that the payment of the $100,000 to Derby was inextricably intertwined with the intent of the parties to return to normal operations in order to continue doing business into the future. It contends that, absent sales against which to provide quarterly credits to Derby, PMC has no obligation to continue paying the debt. PMC cannot have it both ways. It contends that the return to normal operations was a cornerstone of the settlement, yet it asserts that a breach of the sales terms which govern those operations is not substantial and material. PMC has cited neither law nor fact to substantiate this contention.

## IV. Conclusion

The court finds that no genuine issue of material fact exists with respect to the issue of rescission of the settlement.

The court finds that PMC's unauthorized substitution of another foam for the Toilon which Derby specified constituted a breach of their sales terms. The court finds that the unauthorized change in the description of the product also constituted a breach. The court further finds that Derby reserved the right to enforce these terms in its relationship with PMC, despite its prior acceptance of shipments of the substitute foam. As a result of these breaches, the parties did not return to normal business operations, a substantial and material requirement to the successful completion of

- 8 -

the settlement. As the return to normal operations was an essential term of the agreement, Derby is entitled to partial summary judgment permitting it to rescind the settlement.

In light of our ruling permitting rescission of the settlement, we must deny PMC's motion for summary judgment in its entirety. Additionally, the motions to supplement plaintiff's response to defendant's motion for summary judgment (DN 52) and the motion of the defendant to strike (DN 53) will be denied as moot.

A separate order will be entered this date in accordance with this opinion.